## A10A0283. BLASH v. THE STATE.
### (697 SE2d 265)

BARNES, Presiding Judge.

A jury convicted Joshua Blash of one count of rape and two counts of aggravated sodomy involving two victims. He appeals, contending the evidence against him was insufficient and enumerating 11 additional errors. For the reasons that follow, we affirm.

We view the evidence on appeal in the light most favorable to the verdict, and no longer presume the defendant is innocent. We do not weigh the evidence or decide the witnesses' credibility, but only determine if the evidence is sufficient to sustain the convictions. *Brown v. State*, 293 Ga. App. 633 (667 SE2d 899) (2008). We construe the evidence and all reasonable inferences from the evidence most strongly in favor of the jury's verdict. Id.

1. Blash contends the evidence against him was insufficient, because hair from which the State obtained his DNA was not found on the first victim, only in the room where she was assaulted, and because the second victim did not identify him until several years after the assault. He also asserts that the trial court erred in allowing an expert in sexual assault examination to testify regarding the ultimate issue in the rape charge, which was whether the victim had been penetrated.

Viewed most strongly in favor of the verdict, the evidence at trial established that in August 2001, a woman heard her cats making strange noises on her screened-in porch and went out there to find a man climbing through the screen he had just cut. The man immediately began striking the victim in the face with his fists and threatening to kill her. He knocked her down, dragged her into her house, and began pounding her head against the floor, but she continued to fight and managed to kick him off her briefly. She ran into her yard but the assailant came after her and knocked her to the ground again. He pulled her shorts and underwear to the side and put his mouth on her vagina, "saying horrible things," while the victim continued screaming for help. An elderly neighbor across the street came out of her house and said she had called 911, but the man kept fighting the victim and trying to pull her back inside her house. Twenty minutes after the man began assaulting the victim, a male neighbor finally came to the yard and the assailant ran off. The victim described the man as young, slim, about her height of five feet eight inches, with a medium complexion.

Three months later and a mile and a half away, an elementary

school teacher was violently assaulted in her classroom trailer by a young man wearing a bandana tied over his face. The man came into the trailer and sprayed a fire extinguisher at the victim, then punched her in the face, breaking her nose and knocking her to the floor. The two fought, and the victim remembered having her hands in her assailant's hair. After he threatened to kill her and slammed her head onto the floor, the victim blacked out and came to standing in the doorway of another trailer asking for help. She was wearing her pants but no underwear, and was taken to the hospital for treatment of multiple injuries.

A nurse who was declared an expert in sexual assault examinations testified about the victim's injuries. The orbits of the victim's eyes were red and the whites of her eyes were bloody. Her right ear was black and blue, her nose was full of dried blood, the front and right side of her face were "very much traumatized by blunt force," her nose was cut, she had a bite mark on her hip, and her knees were scraped. The victim suffered numerous injuries around her labia and rectum, including bruising and discoloration, as if someone had used blunt force trauma to try to penetrate her. The nurse also found skin and blood inside the victim's labia majora.

The nurse indicated in her written report that the victim's vagina and rectum had been penetrated, based on the blunt force trauma in that area. Although she could not testify for certain that the victim had been penetrated because she found no internal injuries, the external injuries established "the potential to have had penetration." This testimony was not a comment on the ultimate issue as to whether rape and aggravated sodomy occurred, but was permissible testimony that the victim's injuries were consistent with penetration. See *Gray v. State*, 291 Ga. App. 573, 578 (2) (662 SE2d 339) (2008). Further, the witness was properly tendered and accepted as an expert in the subject of sexual assault examinations. *Rodriguez v. State*, 281 Ga. App. 129, 131-132 (2) (635 SE2d 402) (2006).

A crime scene investigator who processed the scene found fire extinguisher spray and blood on the floor of the second victim's trailer. He also found four separate clumps of hair on top of the spray, which he bagged separately. After the state crime laboratory found no DNA evidence in the victim's rape assault kit, the investigator sent the hair to the crime laboratory for DNA testing. As a result of that testing, in October 2006 crime lab personnel gave the detective Blash's name as a suspect. The detective obtained a search warrant for Blash's DNA, which matched the DNA found on the hair in the trailer where the second victim was assaulted, and Blash was indicted.

That detective had also been involved in the investigation of the

August 2001 assault at the first victim's house, and always thought the two crimes were connected, because both were "blitz-type attack[s]," the general physical description and age of the attacker were similar, and the locations were close to each other. When the detective received the lead from the crime lab in October 2006, he located the first victim in south Florida and sent a photographic lineup to local law enforcement there, which included a picture of Blash taken in 2002. The victim identified Blash in the lineup and again in court, explaining that she would never forget the face of the man who said he was going to kill her, which she saw in her nightmares.

Blash argues that the State failed to present evidence of penetration, an essential element of rape and aggravated sodomy. The victim blacked out during the attack, and therefore could not testify regarding this element, but as noted earlier, the sexual assault examination nurse was properly qualified as an expert and testified that the victim's external injuries established the potential for penetration. The jury was authorized to conclude, based on the nurse's testimony and the medical evidence, that penetration had occurred.

We conclude that the evidence as outlined above was sufficient for a rational trier of fact to find Blash guilty beyond a reasonable doubt of aggravated sodomy of the first victim and rape and aggravated sodomy of the second victim. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Blash contends the trial court erred in denying his request to have two jurors struck for cause. One juror said his mother had been a rape victim and his cousin had been accused of rape, but that these factors would not affect his ability to be fair and impartial. The other juror knew the second victim as a customer in the hair salon where the juror worked, but was not a friend and had never discussed the crime with her. The juror also said her acquaintance with the victim would not affect her ability to be fair and impartial to both sides. The trial court did not abuse its discretion in determining that neither juror expressed a bias or an opinion of guilt so fixed and definite that he or she could not decide the case based on the law and the evidence. *Clark v. State*, 265 Ga. App. 112, 114 (593 SE2d 28) (2003).

3. Blash contends the trial court erred in denying his motion for continuance, which he sought because he was allegedly under the influence of medication that "made him extremely sedated." The trial court concluded that Blash was simply trying to delay his trial. It reviewed Blash's successful request for a continuance the previous month, and noted that a week earlier Blash unsuccessfully sought to terminate his lawyer the night before the case was specially set for trial. Blash then renewed the motion to terminate his lawyer and

said his family was going to hire a lawyer, but the trial court checked with the two lawyers Blash named. One had declined representation and the other had never heard of Blash. The court found as a matter of fact that Blash was attempting to delay the trial because he was serving another sentence and would rather be in the county jail than the state prison system. Blash responded that he was able to communicate with his lawyer, but that he was "under the influence" because he had taken his regular medication three hours later than usual the night before. The trial court reviewed a letter in which a nurse from the jail's medical center stated that Blash had been given no medication that day, and ordered the State to produce the nurse in person for questioning under oath. While waiting for the witness, the court began to review the charges, penalties, and plea offers with Blash, who when asked if he understood the aggravated assault charge responded that he did not understand and that there were "some questions like that may be asked of me that I might not be comfortable . . . answering them because due to the fact, I told you, see I'm under the influence of psychotic meds and I feel like if I was sober I might answer in a different way."

The nurse appeared and authenticated a medication log sheet as a business record, which the court admitted without objection. She testified that Blash was given certain medications at some time between 7:00 p.m. and 9:00 p.m. the night before and no medication since then. Based on her knowledge of these medications, and on the fact that Blash had refused the medications several times in the previous month, the nurse thought that Blash's ability to understand the proceedings and communicate with his lawyer would not be impaired.

We review for abuse of discretion a trial court's ruling on a motion for continuance. *Foote v. State*, 251 Ga. App. 427, 429 (1) (553 SE2d 644) (2001). Relying on the nurse's description of the medications, as well as its own observations of Blash, the trial court concluded that Blash was able to communicate with counsel and assist in his own defense.

> [T]his Court is in a particularly poor position to second-guess the trial court's finding that [Blash] was capable of communicating with counsel and assisting in his own defense. Unlike the trial court, we did not observe [Blash] at the trial. Accordingly, the trial court did not err in refusing to grant [Blash] a continuance.

Id.

4. Regarding Blash's argument about the legality of his sentence and his eligibility for parole, the trial court addressed that issue upon

resentencing and gave Blash the relief he sought. Thus, this argument is moot.

5. We have reviewed Blash's remaining enumerations of error regarding his motion to sever, several jury charges, ineffective assistance, and the admission of his prior felonies as impeachment evidence, and find no error.

*Judgment affirmed. Blackburn and Bernes, JJ., concur.*

DECIDED JUNE 22, 2010.

*Robert M. Bearden, Jr.*, for appellant.

*Howard Z. Simms, District Attorney, Dorothy V. Hull, Assistant District Attorney*, for appellee.